**Gregory R. Bockin**
**Karen M. Klotz**
**Brendan P. McGlynn**
**Kevin E. Levenberg**
*Attorneys for Plaintiff*
**SECURITIES AND EXCHANGE COMMISSION**
**One Penn Center**
**1617 JFK Boulevard, Suite 520**
**Philadelphia, PA 19103**
**Telephone:  (215) 597-3100**
**Email: klotzk@sec.gov**

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **Civil Action No. 2:23-cv-01810** |
| **v.** | **JURY TRIAL DEMANDED** |
| **SEAN WYGOVSKY and CHRISTOPHER MATTHAEI,** | |
| **Defendants.** | |

### <u>COMPLAINT</u>

Plaintiff Securities and Exchange Commission ("Commission"), 1617 JFK Boulevard, Suite 520, Philadelphia, Pennsylvania 19103, files this Complaint against the following two defendants:

    1.    Sean Wygovsky
            14072 Darkwood Circle
            Centerville, VA 20121

    2.    Christopher Matthaei
            909 Jordan Drive
            Brielle, NJ 08730

The Commission alleges as follows:

## SUMMARY OF THE ACTION

1.      This action involves a multi-million dollar insider trading scheme orchestrated by Sean Wygovsky ("Wygovsky"), a former trader at a Canadian Asset Manager ("Asset Manager"), and Christopher Matthaei ("Matthaei"), a former partner of a U.S. broker-dealer ("Broker-Dealer").

2.      From May 2020 until April 2021, Wygovsky, a close friend and significant business client of Matthaei, tipped Matthaei material nonpublic information in advance of at least seven merger announcements involving Special Purpose Acquisition Companies ("SPACs").

3.      Wygovsky learned material nonpublic information about SPAC mergers through his employment at the Asset Manager, which was involved in financing transactions for the mergers.  The information Wygovsky provided to Matthaei concerning SPAC mergers was confidential and Wygovsky had an explicit duty to Asset Manager not to share it with Matthaei.

4.      To avoid detection and conceal the scheme, Wygovsky often tipped Matthaei material nonpublic information through communications on the encrypted messaging application Telegram, which they knew could not be monitored by the Asset Manager and the Broker-Dealer.

5.      On the basis of Wygovsky's tips, Matthaei unlawfully purchased securities of at least seven SPACs ahead of merger announcements, earning profits of approximately $3,427,330.

6.      In April 2021, Matthaei learned that Wygovsky was the subject of an unrelated securities fraud investigation by the Commission.  Matthaei disclosed the Commission's investigation to Wygovsky and they decided to halt their insider trading scheme.

7.      By engaging in the conduct described in this Complaint, Wygovsky and Matthaei (collectively, "Defendants") violated, and unless enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

8.      The Commission brings this action pursuant to Sections 21(d), 21(e), and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)–(e), 78u-1] seeking a final judgment that permanently enjoins Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, prohibits defendant Matthaei from serving as an officer or director of any entity having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act, orders Defendants to pay disgorgement, prejudgment interest, and civil monetary penalties, and awards any other relief the Court deems appropriate.

9.      This Court has jurisdiction over this action under Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)-(e), § 78aa].

10.      Venue is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts, practices, and courses of business constituting the alleged violations alleged in this Complaint occurred in the District of New Jersey.  Defendant Matthaei resides in this District and, during the relevant time period, worked in this District.

## DEFENDANTS

**A.      Sean Wygovsky**

11.      Wygovsky, age 42, resides in Centreville, Virginia.  Between 2013 and 2021, Wygovsky resided in Toronto, Canada, and worked as a trader at the Asset Manager.

3

12.     On July 2, 2021, the Commission charged Wygovsky with violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5]. The charges stemmed from Wygovsky's trading in personal accounts ahead of large securities trades that were executed on the same days by the Asset Manager for its client accounts, an illicit practice known as "front running." *See Securities and Exchange Commission v. Wygovsky*, 1:21-cv-5730 (S.D.N.Y. July 2, 2021).

13.     On January 28, 2022, Wygovsky consented to the entry of a judgment in the front running matter which enjoined him from future violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10(b)(5) promulgated thereunder. A final judgment is pending.

14.     On September 29, 2022, in a parallel criminal case brought in the United States District Court for the Southern District of New York concerning the front running scheme, Wygovsky pleaded guilty to one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. § 240.10b-5. *See United States v. Wygovsky*, 1:21-cr-718 (S.D.N.Y. July 1, 2021). Wygovsky's sentencing is pending.

**B.     Christopher Matthaei**

15.     Matthaei, age 44, resides in Brielle, New Jersey. Matthaei was associated with registered broker-dealers from at least 2001 to 2022, and holds Series 7, 55, 63, and 65 licenses.

16.     From 2010 until early 2022, Matthaei worked at the Broker-Dealer in its Red Bank, New Jersey office as a Managing Director and partner.

17.     In early 2022, Matthaei resigned from the Broker-Dealer.

18.     During the relevant time, Matthaei maintained brokerage accounts at Broker 1, Broker 2, and Broker 3 (collectively, "Trading Accounts"), among others.

## RELEVANT ENTITIES

19.     The Asset Manager is a major asset management firm and a hedge fund adviser incorporated and headquartered in Ontario, Canada.  It has been registered with the Commission as an investment adviser since April 2021.  Prior to April 2021, the Asset Manager was a foreign exempt reporting adviser with the Commission.

20.     The Broker-Dealer is an institutional brokerage firm headquartered in Charlotte, North Carolina, with additional offices throughout the United States, including in New Jersey.

## TERMS USED IN THIS COMPLAINT

**A.      SPACs**

21.     A SPAC is a publicly traded shell company with no underlying operating business that is formed to raise capital through an initial public offering ("IPO") for the purpose of using the proceeds to acquire an unspecified company at a later, unspecified date.

22.     SPACs provide a method for a private company to transition into a publicly traded company through a merger with the SPAC.

**B.      Units, Common Stock, Warrants, and Long Positions**

23.     Generally, in a SPAC IPO, investors purchase units.  Each unit typically consists of one share of common stock, a form of equity ownership in a corporation, and a fraction of a warrant.

24.     A warrant gives the holder the right to purchase from the SPAC a certain number of shares of common stock at a specific price and on a date in the future.  The precise terms of warrants vary among SPACs.

25.    Following the IPO, the components comprising the units become separable, such that the investor can trade units, shares of common stock, or warrants.  Each of these securities is listed separately on U.S. securities exchanges.

26.    A long position in a security refers to the purchase of an asset with the expectation it will increase in value in the future.

**C.    PIPEs and Wall-Crossing**

27.    Private Investment in Public Equity ("PIPE") refers to the private placement of securities of an already public company that is made typically to institutional accredited investors.

28.    PIPE transactions may involve the sale of common stock, warrants, or other equity or equity-like securities of an already public company.

29.    SPAC merger parties commonly rely on PIPEs to provide supplemental financing for their merger transactions.

30.    A SPAC's placement agent typically provides potential PIPE investors material nonpublic information pursuant to a "wall-crossing" procedure, which requires the potential investor to agree to maintain the confidentiality of information shared by the placement agent and to cease or restrict trading in the securities of the SPAC.

31.    After the potential investor agrees to be wall-crossed, the placement agent provides the names of the merger parties and other information it believes helpful, which may include nonpublic financials, business plans, revenue projections, valuations, and confidential terms of the merger agreement.  The placement agent may also facilitate "roadshow" meetings with management from the SPAC and target company that market the PIPE investment.

32.    After evaluating this information, the potential investor decides whether to invest in the PIPE.  For many SPAC deals, this process occurs when merger negotiations are at an advanced stage: the SPAC has identified a target, and the SPAC and target have hired financial, legal, and other advisors and commenced negotiations of merger terms and due diligence.

**D.    Bloomberg Terminal and Bloomberg Chats**

33.    A Bloomberg Terminal is a computer hardware and software system provided by the financial data vendor Bloomberg L.P. that allows users to monitor and analyze financial market data and news, among other services.

34.    A Bloomberg Terminal provides a chat function ("Bloomberg Chats") that permits users to communicate directly with one another.

35.    Wygovsky and Matthaei used Bloomberg Terminals in connection with their employment.  Both the Asset Manager and the Broker-Dealer retained, and had the ability to review, employees' Bloomberg Chats.

**E.    Telegram**

36.    Telegram is a communications service that provides optional end-to-end encrypted chats, known as "secret chats."

37.    Telegram's secret chats use end-to-end encryption, leave no trace on Telegram's servers, support self-deleting chat messages, and do not allow message forwarding.  Secret chats can only be accessed on their devices of origin.

38.    Telegram also supports end-to-end encrypted voice and video calls.

<u>**FACTUAL ALLEGATIONS**</u>

**A.    Wygovsky and Matthaei Shared a Close Business and Personal Relationship**

39.    Wygovsky and Matthaei had a close business and personal relationship since 2013.  Matthaei provided market research as well as execution services for Wygovsky's trading

at the Asset Manager, which was a significant client of the Broker-Dealer.  As a partner at the Broker-Dealer, Matthaei earned compensation based in part on revenue generated through Wygovsky's trading at the Broker-Dealer.

40.     Wygovsky and Matthaei communicated daily through Bloomberg Chats and in work emails, discussing business and personal matters.  Wygovsky also placed trade orders with Matthaei and sought Matthaei's advice on markets and securities through those communications.

41.     Wygovsky and Matthaei also communicated frequently with each other using encrypted messaging applications on their personal mobile phones, including Telegram, which were not monitored by the Asset Manager and the Broker-Dealer.

42.     Between 2013 and 2020, Wygovsky, Matthaei, and their families vacationed together one or more times each year.  During these trips, Matthaei often paid for the Wygovsky family's lodgings and other significant expenses.

43.     As set forth below, Wygovsky tipped Matthaei about SPAC mergers so that Matthaei, as a close friend and business partner, would earn significant illicit trading profits for himself, thereby strengthening their relationship.  Wygovsky also tipped Matthaei with the expectation that Matthaei would share some of the illicit trading profits with Wygovsky, including by continuing to pay for travel by Wygovsky's family.

**B.     Wygovsky's Duty to Maintain Confidentiality of Material Nonpublic Information**

44.     Wygovsky was subject to the Asset Manager's Policies and Procedures Manual, under which employees were "strictly forbidden from engaging in Insider Trading" and "must not knowingly tip another party when they are in possession of [material nonpublic information]."

45.     The Asset Manager's Policies and Procedures Manual specified that advanced knowledge of merger announcements were examples of "material" information, and that employees in Canada may be subject to U.S. insider trading laws.

46.     The Asset Manager's Policies and Procedures Manual also stated that certain electronic communications, such as firm emails and Bloomberg Chats, "may be searched, reviewed, or produced for any purpose by [Asset Manager]" and were subject to surveillance by the Asset Manager's compliance personnel "to identify violations of securities laws."

47.     Wygovsky also was subject to the Asset Manager's Code of Ethics, which prohibited employees from "disclosing to persons outside [the Asset Manager] any Confidential Information," which the Code of Ethics defined to include "information … belong[ing] to or received from third parties to whom [the Asset Manager] owes a duty of confidence."

48.     The Code of Ethics also provided that the Asset Manager's "[e]mployees are prohibited from communicating Material Non-Public Information to others, whether they are relatives, friends or business associates."

49.     On August 19, 2019, and October 5, 2020, Wygovsky executed an Employee Letter of Undertaking and Disclosures in which he certified his awareness and understanding of, and compliance with, the Asset Manager's Policies and Procedures Manual and Code of Ethics, including specifically policies and procedures concerning insider trading, electronic communications, and confidentiality.

50.     Wygovsky also received training concerning U.S. insider trading laws.  On October 6, 2020, Wygovsky completed the Asset Manager's Compliance Training, which explained that a "person may be found liable for tipping if they inform another person of [material nonpublic information]."

**C.    The Broker-Dealer's Policies Explicitly Prohibited Matthaei from Trading on Material Nonpublic Information**

51.    Matthaei worked at the Broker-Dealer between 2010 and 2022, and became a partner of the firm in the Broker-Dealer's Event-Driven & Special Situations group, whose services included market commentary concerning mergers and acquisitions of publicly traded companies, including SPACs, as well as trade execution for institutional clients.

52.    Matthaei was subject to the Broker-Dealer's Supervisory Procedures Manual, which prohibited employees from trading "any security of any issuer about which the individual possesses material non-public information at or prior to the time such information is publicly disclosed and available in the marketplace." The Broker-Dealer's Supervisory Procedures Manual specified that advanced information about mergers and acquisitions should be considered "material" information.

53.    The Broker-Dealer's Supervisory Procedures Manual also stated that certain electronic communications, such as firm emails and Bloomberg Chats, were captured and retained by the Broker-Dealer and were subject to review by the firm's Compliance personnel.

54.    Matthaei attested annually, including on December 16, 2019, and December 23, 2020, that he would comply with the Broker-Dealer's insider trading policy.

55.    Matthaei also received training concerning U.S. insider trading laws.  For example, on December 17, 2019, and December 17, 2020, Matthaei attended the Broker-Dealer's Annual Compliance Meeting, at which insider trading laws, recent disciplinary actions, and the firm's insider trading policy were discussed.

**D.    Wygovsky Obtained Material Nonpublic Information Concerning SPAC Mergers Through his Employment at the Asset Manager**

56.    Between 2013 and 2021, Wygovsky worked as a trader at the Asset Manager identifying investment opportunities in U.S. and international public equities, including SPACs, and placing trade orders for the Asset Manager's accounts.

57.    Wygovsky had access to confidential information about SPACs through his work at the Asset Manager, which was an active participant in PIPE transactions that accompanied many SPAC mergers.

58.    The Asset Manager received material nonpublic information from a SPAC's placement agent pursuant to a wall-crossing procedure.  After entering into a confidentiality agreement with the placement agent, the Asset Manager added the SPAC to its trading restricted list and notified all employees, including Wygovsky, of the addition of the SPAC to the restricted list through an email that identified the SPAC but not the merger target ("Restricted List Email").

59.    The Restricted List Email instructed the Asset Manager's employees to cease trading securities of the SPAC, and further stated that the Asset Manager's "restricted list is confidential and should not be discussed and/or distributed externally."

60.    Confidential documents provided by the SPAC placement agent were saved in the Asset Manager's network folders or other repositories.  Access to the files was limited to the Asset Manager's employees with responsibility for evaluating SPAC PIPE opportunities, which for certain deals included Wygovsky.

**E.    Wygovsky Tips Matthaei About the Merger of Tortoise Acquisition Corp. and Hyliion Inc.**

61.    On May 27, 2020, the Asset Manager agreed to be wall-crossed and to keep information confidential in connection with a PIPE offering for a merger between the SPAC

Tortoise Acquisition Corp. ("Tortoise" or "SHLL") and Hyliion Inc. ("Hyliion"), a manufacturer of electric powertrains for commercial vehicles.

62.    Also on May 27, 2020, the Asset Manager's compliance department added Tortoise to the restricted list and notified all employees, including Wygovsky, of the restriction in an email.

63.    On May 28, 2020, at 11:31 a.m., the Asset Manager received a presentation slide deck concerning the Tortoise/Hyliion PIPE investment opportunity ("Tortoise/Hyliion Side Deck"), which described material nonpublic information including, among other things, the terms of the proposed merger between Tortoise and Hyliion and PIPE offering, Hyliion's technology and business plans, and Hyliion's financial projections.  The Tortoise/Hyliion Side Deck also contained a disclaimer that the information reflected therein was confidential and that tipping or trading on the basis of material nonpublic information violates U.S. securities laws.

64.    On May 28, 2020, at 4:08 p.m., a colleague at the Asset Manager sent Wygovsky an email stating: "We are over the wall on a SPAC deal. … The SPAC is SHLL, and is contemplating a merger with Hyliion – it has a lot of similarities to the Nikola deal (VTIQ)." The colleague provided additional nonpublic details concerning Hyliion and the proposed merger and PIPE terms, noting that the parties planned to announce the merger during the week of June 15, 2020.

65.    After receiving this material nonpublic information, Wygovsky tipped Matthaei through communications on Telegram about the merger between Tortoise and Hyliion for the purpose of Matthaei trading based on that information.

66.     Matthaei knew, or was reckless in not knowing, that Wygovsky was not permitted to share material nonpublic information about the merger, and that it was illegal to trade based on that information.

67.     On May 29, 2020, at 7:09 a.m., based on the material nonpublic information Wygovsky provided, Matthaei began entering multiple buy orders for Tortoise common stock and warrants in his brokerage accounts with Broker 1 and Broker 2.

68.     On June 1, 2020, at approximately 1:00 p.m., Wygovsky attended a virtual roadshow via video conference with management of Tortoise and Hyliion during which the Tortoise/Hyliion Side Deck was shown.

69.     At 1:21 p.m., during the virtual roadshow, Wygovsky and Matthaei spoke on a telephone call for approximately three minutes.  During that call, Wygovsky tipped Matthaei material nonpublic information that he learned during the roadshow.

70.     Minutes after that call, at 1:28 p.m. on June 1, 2020, Matthaei entered an additional buy order for 5,000 Tortoise shares in his brokerage account with Broker 1.  Matthaei continued accumulating substantial long positions in Tortoise shares and warrants through June 18, 2020—one day prior to the merger announcement between Tortoise and Hyliion.

71.     At approximately 1:58 p.m. on June 1, 2020, while attending the virtual roadshow, Wygovsky took a photograph with his personal iPhone of his computer screen showing Hyliion management and portions of the Tortoise/Hyliion Side Deck.  Wygovsky sent this photograph to Matthaei using Telegram.

72.     On June 19, 2020, Tortoise and Hyliion announced a merger agreement, and the prices of Tortoise common stock and warrants closed up 37.4% and 181.3%, respectively, from the previous day's closing price.

73.     In total, Matthaei's long position in Tortoise securities generated illicit profits of approximately $1,489,026.

**F.    Matthaei Pays for Wygovsky's Luxury Travel**

74.     On June 27, 2020, following the Tortoise merger announcement, Wygovsky and Matthaei travelled together with their families to Saint Barthélemy in the Caribbean. Matthaei paid a total of approximately $41,950 for the group to travel by private jet, and approximately $76,050 for both families to stay at a luxury private villa.

75.     On August 1, 2020, Matthaei paid approximately $38,500 for Wygovsky and his family to travel from Saint Barthélemy to Nantucket using a private jet.

76.     In Nantucket, Matthaei paid a total of approximately $52,443 for Wygovsky and his family to spend one week in a luxury rental home without Matthaei before being joined by Matthaei's family for a second week in a second luxury rental home.

77.     On August 15, 2020, Wygovsky's family traveled from Nantucket to Toronto on a private jet paid for by Matthaei at a cost of $10,329.

**G.    While Vacationing Together in Saint Barthélemy, Wygovsky Tips Matthaei About Two SPACs Added to the Asset Manager's Restricted List**

78.     In July 2020, when vacationing with Matthaei in Saint Barthélemy, Wygovsky tipped Matthaei the names of SPACs placed on the Asset Manager's restricted list.

79.     Both Matthaei and Wygovsky continued working while in Saint Barthélemy.

**1.    Wygovsky Tips Matthaei that the SPAC Healthcare Merger Corp. Has Been Placed on the Asset Manager's Restricted List**

80.     On July 9, 2020, the Asset Manager agreed to be wall-crossed and to keep information confidential in connection with a PIPE offering for a merger between the SPAC Healthcare Merger Corp. ("Healthcare Merger") and SOC Telemed, a telemedicine technology provider.

81.    On July 9, 2020, at 10:44 a.m., Wygovsky received a Restricted List Email from the Asset Manager's Compliance Department notifying him that Healthcare Merger had been placed on the Asset Manager's restricted list and that trading in the SPAC was prohibited.

82.    After receiving the Restricted List Email, while vacationing with Matthaei in the same private villa in Saint Barthélemy, Wygovsky tipped Matthaei that Healthcare Merger had been placed on the Asset Manager's restricted list, expecting that he would use that information to place trades.  This information reflected that the SPAC was in advanced merger negotiations, had approached the Asset Manager about a PIPE investment, and a merger could be publicly announced soon.

83.    Matthaei knew, or was reckless in not knowing, that Wygovsky was not permitted to share material nonpublic information about the merger, and that it was illegal to trade based on that information.

84.    Approximately forty minutes after Wygovsky received the Restricted List Email for Healthcare Merger, at 11:24 a.m. on July 9, 2020, Matthaei began entering his first buy orders for Healthcare Merger shares and warrants in his brokerage account with Broker 2.

85.    Between July 9, 2020, and July 29, 2020, Matthaei accumulated substantial long positions in Healthcare Merger stock, warrants, and units in his Trading Accounts.

86.    On July 29, 2020, Healthcare Merger publicly announced a merger with SOC Telemed.  The prices of Healthcare Merger common stock and warrants closed up 5.5% and 0.05%, respectively, from the previous day's closing price.  The price of Healthcare Merger units closed up 0.17%.

87.    In total, Matthaei's long position in Healthcare Merger securities generated illicit profits of approximately $68,771.

2.     **Wygovsky Tips Matthaei that the SPAC dMY Technology Group, Inc. Has Been Placed on the Asset Manager's Restricted List**

88.     On July 15, 2020, the Asset Manager agreed to be wall-crossed and to keep information confidential in connection with a PIPE offering for a merger between the SPAC dMY Technology Group, Inc. ("dMY Technology") and Rush Street Interactive, LP ("Rush Street"), an online casino and sports betting company.

89.     On July 15, 2020, at 9:36 a.m., Wygovsky received a Restricted List Email from the Asset Manager's Compliance Department notifying him that dMY Technology had been placed on the Asset Manager's restricted list and that trading in the SPAC was prohibited.

90.     After receiving the Restricted List Email, while vacationing with Matthaei in the same private villa in Saint Barthélemy, Wygovsky tipped Matthaei that dMY Technology had been placed on the Asset Manager's restricted list, expecting that he would use that information to place trades.  This information reflected that the SPAC was in advanced merger negotiations, had approached the Asset Manager about a PIPE investment, and a merger could be publicly announced soon.

91.     Matthaei knew, or was reckless in not knowing, that Wygovsky was not permitted to share material nonpublic information about the merger, and that it was illegal to trade based on that information.

92.     Approximately 45 minutes after Wygovsky received the Restricted List Email for dMY Technology, at 10:17 a.m. on July 15, 2020, Matthaei entered his first buy order for dMY Technology shares in his brokerage account with Broker 2.

93.     Between July 15, 2020 and July 23, 2020, Matthaei accumulated substantial long positions in dMY Technology stock, warrants, and units in his Trading Accounts.

94.     On July 23, 2020, after market close, Bloomberg News reported that dMY Technology was engaging in negotiations to acquire Rush Street.  On the following trading day, the prices of dMY Technology common stock and units closed up 4.1% and 3.1%, respectively, from the previous day's closing price.  The price of dMY Technology warrants closed at the same price as the previous day.

95.     In total, Matthaei's long position in dMY Technology securities generated illicit profits of approximately $22,479.

## H.     Wygovsky Tips Matthaei About SPAC Merger Targets

96.     In early 2021, Wygovsky began working actively on SPAC PIPEs for the Asset Manager and regularly received confidential deal documents, attended roadshows, and conducted independent research on the SPACs' merger targets.

### 1.     Wygovsky Tips Matthaei about a Merger between the SPAC Software Acquisition Group Inc. II and Otonomo Technologies Ltd.

97.     On January 25, 2021, the Asset Manager agreed to be wall-crossed and to keep information confidential in connection with a PIPE offering for a merger between the SPAC Software Acquisition Group Inc. II ("Software Acquisition II") and Otonomo Technologies Ltd. ("Otonomo"), an automotive software and data services provider.

98.     On January 25, 2021, at 9:43 a.m., Wygovsky received a Restricted List Email from the Asset Manager's Compliance Department stating that Software Acquisition II had been added to the Asset Manager's confidential restricted list.

99.     At 10:14 a.m. that day, Wygovsky received a chat message from a colleague at the Asset Manager stating in part: "New PIPE: Otonomo, automotive data platform. … $125mm PIPE."  A copy of the confidential slide deck for the roadshow concerning the proposed merger

between Software Acquisition II and Otonomo ("Software Acquisition II/Otonomo Slide Deck") was included in the chat message.

100.     The Software Acquisition II/Otonomo Slide Deck described material nonpublic information including, among other things, the terms of the merger agreement, Otonomo's technology and business plans, and its internal financial projections.  The Software Acquisition II/Otonomo Slide Deck also included a disclaimer that the information it contained was confidential and that tipping or trading on the basis of material nonpublic information violates the U.S. securities laws.

101.     After receiving this material nonpublic information, Wygovsky tipped Matthaei through communications on Telegram about the merger between Software Acquisition II and Otonomo, expecting that he would use that information to place trades.

102.     Matthaei knew, or was reckless in not knowing, that Wygovsky was not permitted to share material nonpublic information about the merger, and that it was illegal to trade based on that information.

103.     On January 25, 2021, at 11:32 a.m., Matthaei began entering multiple buy orders for Software Acquisition II shares and warrants in his Trading Accounts.  Between January 25, 2021 and January 29, 2021, Matthaei accumulated substantial long positions in Software Acquisition II stock and warrants in his Trading Accounts.

104.     On January 29, 2021, after market close, Bloomberg News reported that Software Acquisition II was engaging in talks to acquire Otonomo.  On the following trading day, the prices of Software Acquisition II common stock and warrants closed up 6% and 31.3%, respectively, from the previous day's closing price.

105.    In total, Matthaei's long position in Software Acquisition II securities generated illicit profits of approximately $104,247.

### 2.    Wygovsky Tips Matthaei about a Merger between SPAC Fusion Acquisition Corp. and MoneyLion, Inc.

106.    On January 25, 2021, the Asset Manager agreed to be wall-crossed and to keep information confidential in connection with a PIPE offering for a merger between the SPAC Fusion Acquisition Corp. ("Fusion") and the financial technology company MoneyLion Inc. ("MoneyLion").

107.    On January 25, 2021, Wygovsky received a Restricted List Email from the Asset Manager's Compliance Department stating that Fusion has been added to the Asset Manager's restricted list.

108.    On January 26, 2021, at 5:49 p.m., Wygovsky received a chat message from a colleague that stated: "New PIPE: MoneyLion Raising $180MM. [Enterprise Value] $2.4bn, market cap $2.8bn."  The chat message included a link to access the roadshow presentation slide deck concerning the merger between Fusion and MoneyLion.

109.    After receiving this material nonpublic information, Wygovsky tipped Matthaei through communications on Telegram about the merger between Fusion and MoneyLion, expecting that he would use that information to place trades.

110.    Matthaei knew, or was reckless in not knowing, that Wygovsky was not permitted to share material nonpublic information about the merger, and that it was illegal to trade based on that information.

111.    On January 27, 2021, at 11:25 a.m., Matthaei began entering multiple buy orders for Fusion shares in his brokerage account with Broker 2.  Between January 27, 2021 and January 28, 2021, Matthaei accumulated long positions in Fusion stock in his Trading Accounts.

112.    On January 28, 2021, after market close, Bloomberg News reported that Fusion was engaging in talks to acquire MoneyLion. On the following trading day, the prices of Fusion common stock closed up 0.9% and 0.7%, respectively, from the previous day's closing price.

113.    In total, Matthaei's long position in Fusion securities generated illicit profits of approximately $13,462.

### 3.    Wygovsky Tips Matthaei about a Merger between the SPAC Atlas Crest Investment Corp. and Archer Aviation Inc.

114.    On January 29, 2021, the Asset Manager agreed to be wall-crossed and to keep information confidential in connection with a PIPE offering for a merger between the SPAC Atlas Crest Investment Corp. ("Atlas Crest") and Archer Aviation Inc. ("Archer"), a manufacturer of electric vertical takeoff and landing aircraft.

115.    On January 29, 2021, at 9:55 a.m., Wygovsky received a Restricted List Email from the Asset Manager's Compliance Department informing him that Atlas Crest had been added to the Asset Manager's confidential restricted list.

116.    On January 31, 2021, at 4:54 p.m., Wygovsky's supervisor emailed him a confidential roadshow presentation slide deck for the merger between Atlas Crest and Archer ("Atlas Crest/Archer Slide Deck").

117.    The Atlas Crest/Archer Slide Deck described material nonpublic information including, among other things, the terms of the merger agreement, Archer's technology and business plans, and its internal financial projections. The Atlas Crest/Archer Slide Deck also included a disclaimer that it contained confidential information.

118.    Also on January 31, 2021, at 5:43 p.m., Wygovsky downloaded to his mobile phone the Atlas Crest/Archer Slide Deck, financial models, and other material nonpublic

information obtained by the Asset Manager in connection with its review of the proposed

transaction.

119.    On February 1, 2021, at 1:26 p.m., Wygovsky received an email notifying him

that the files "Archer SPAC meeting notes" and the Atlas Crest/Archer roadshow slide deck had

been added to a shared folder to which Wygovsky had access.

120.    After receiving this material nonpublic information, Wygovsky tipped Matthaei

through communications on Telegram about the merger between Atlas Crest and Archer,

expecting that he would use that information to place trades.

121.    Matthaei knew, or was reckless in not knowing, that Wygovsky was not permitted

to share material nonpublic information about the merger, and that it was illegal to trade based

on that information.

122.    On February 2, 2021, at 3:59 p.m., Matthaei entered a buy order for Atlas Crest

shares in his brokerage account with Broker 1.  Between February 2, 2021 and February 10,

2021, Matthaei accumulated substantial long positions in Atlas Crest stock and warrants in his

Trading Accounts.

123.    On February 10, 2021, Atlas Crest announced that it had entered into an

agreement to acquire Archer.  After the merger announcement, the price of Atlas Crest shares

and warrants closed up 21.7% and 60.5%, respectively.

124.    In total, Matthaei's long position in Atlas Crest securities generated illicit profits

of approximately $644,108.

### 4.    Wygovsky Tips Matthaei about a Merger between the SPAC Artius Acquisition Inc. and Origin Materials Inc.

125.    On February 1, 2021, the Asset Manager agreed to be wall-crossed and to keep

information confidential in connection with a PIPE offering for a merger between the SPAC

Artius Acquisition Inc. ("Artius") and Origin Materials Inc. ("Origin"), a manufacturer of sustainable, "carbon negative" materials.

126.     On February 1, 2021, at 3:29 p.m., Wygovsky received a Restricted List Email from the Asset Manager's Compliance Department informing him that Artius had been added to the Asset Manager's confidential restricted list.

127.     At 5:28 p.m. that same day, Wygovsky received a roadshow presentation slide deck for the proposed merger between Artius and Origin ("Artius/Origin Slide Deck").  The Artius/Origin Slide Deck described material nonpublic information including, among other things, the terms of the merger agreement, Origin's technology and business plans, and its internal financial projections.  The Artius/Origin Slide Deck included a disclaimer that it contained confidential information.

128.     On February 1, 2021, at 8:12 p.m., Wygovsky downloaded the Artius/Origin Slide Deck to his personal mobile phone.

129.     After receiving this material nonpublic information, Wygovsky tipped Matthaei through communications on Telegram about the merger between Artius and Origin, expecting that he would use that information to place trades.

130.     Matthaei knew, or was reckless in not knowing, that Wygovsky was not permitted to share material nonpublic information about the merger, and that it was illegal to trade based on that information.

131.     On February 3, 2021, at 12:55 p.m., Matthaei began entering multiple buy orders for Artius shares and warrants in his Trading Accounts.

132.     Also on February 3, 2021, at approximately 4:45 p.m., Wygovsky attended a virtual roadshow via video conference concerning the merger of Artius and Origin.

133.    Between February 3, 2021, and February 12, 2021, Matthaei accumulated a substantial long position in Artius shares and warrants based on the material nonpublic information he received from Wygovsky.

134.    On February 12, 2021, after market close, Bloomberg News reported that Artius was engaging in talks to acquire Origin.  On the following trading day, the price of Artius shares and warrants closed up 24.2% and 58.8%, respectively, from the previous day's closing price.

135.    In total, Matthaei's long position in Artius securities generated illicit profits of approximately $1,085,237.

136.    In total, Matthaei's unlawful trading on the basis of Wygovsky's tips for the seven SPAC mergers set forth above generated illicit profits of approximately $3,427,330.

**I.    Wygovsky Is Arrested in Connection with a Front Running Scheme**

137.    On or about March 5, 2021, the Broker-Dealer received a document request from the Commission in connection with its investigation into a front running scheme operated by Wygovsky.

138.    On or about April 4, 2021, a colleague at the Broker-Dealer told Matthaei that the Broker-Dealer had received a document request from the Commission concerning Wygovsky, and that the Commission requested that the Broker-Dealer not disclose the request to Wygovsky.

139.    Shortly after speaking with the colleague, Matthaei nonetheless notified Wygovsky about the Commission's document request through communications over Telegram. They agreed to halt their insider trading scheme at that time due to the Commission's scrutiny of Wygovsky.

140.    On July 2, 2021, Wygovsky was arrested and charged by the United States Attorney's Office for the Southern District of New York in connection with a front running scheme.

141.    The same day of Wygovsky's arrest, the Commission filed a civil action against Wygovsky in connection with the front running scheme, charging him with violations of Sections 17(a)(1) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (a)(3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (c)].

142.    After Wygovsky's arrest, Wygovsky stayed for more than two weeks in a hotel in Red Bank, New Jersey, near Matthaei's residence and office for the Broker-Dealer.  During an in-person meeting, Matthaei gave Wygovsky $5,000 in cash and showed him a bank account balance of approximately $2.5 million, which he promised to give to Wygovsky at a later time. Matthaei also agreed to sign a $500,000 bail bond on Wygovsky's behalf, which he executed on August 2, 2021.

## DEFENDANTS VIOLATED THE FEDERAL SECURITIES LAWS

143.    At all relevant times, Wygovsky owed a duty to the Asset Manager to maintain the confidential information given to him during the course of his employment.  Wygovsky attested annually that he had a duty to keep confidential information "belong[ing] to or received from third parties to whom [the Asset Manager] owes a duty of confidence," which included information received by the Asset Manager from SPAC placement agents pursuant to wall-crossing agreements.

144.    In breach of his duties, Wygovsky tipped Matthaei about the names of certain SPACs that were added to the Asset Manager's confidential restricted list and the identity of, and confidential details about, certain SPAC merger targets and merger agreement terms.

145.    A reasonable investor would have viewed the information relating to SPAC mergers that Wygovsky tipped to Matthaei as being important to their investment decision. Specifically, the information indicated that the relevant SPACs were in advanced merger discussions and could imminently enter into, and publicly announce, a merger agreement, and for certain deals the information reflected confidential details about the SPACs' merger targets and merger agreement terms.

146.    Wygovsky knew or was reckless in not knowing that the information he possessed through his work at the Asset Manager regarding SPACs added to the confidential restricted list and the identity of SPAC merger targets was material and nonpublic, or he acted with reckless disregard of the nature of the information.

147.    Wygovsky provided these tips to Matthaei expecting that he would use the information to place trades and in exchange for, and with the expectation of receiving, a benefit. Wygovsky shared a close personal friendship with Matthaei.  They also had a lucrative business relationship in which Matthaei provided trade execution and other services to Wygovsky and obtained compensation tied to those services.  Wygovsky was motivated to tip Matthaei in order to strengthen both their personal and business relationship and Wygovsky intended to benefit Matthaei.

148.    Wygovsky also provided these tips to Matthaei as part of a quid pro quo, with the expectation that Matthaei would share his illicit trading profits with Wygovsky and continue to pay for luxury travel by Wygovsky's family.

149.    Matthaei knew or recklessly disregarded that the information tipped to him by Wygovsky was material and nonpublic.

150.    At all relevant times, Matthaei knew, consciously avoided knowing, was reckless in not knowing, or should have known that material nonpublic information Wygovsky tipped to him had been disclosed in breach of Wygovsky's duties of trust or confidence, or otherwise misappropriated, for the obvious benefit of providing it to a close personal friend and business partner and as part of a quid pro quo.

151.    Matthaei knew or was reckless in not knowing that SPAC merger plans were confidential and that the Asset Manager, and Wygovsky, were subject to a duty not to disclose information about those plans to third parties.

152.    Matthaei received training in insider trading laws and knew or was reckless in not knowing that it was illegal to trade on the basis of Wygovsky's tips.

153.    Wygovsky and Matthaei acted with an intent to deceive, manipulate, or defraud, and knew or were reckless in not knowing that their conduct was deceptive.

### CLAIM FOR RELIEF
**Fraud in Connection with the Purchase and Sale of Securities**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

154.    The Commission re-alleges and incorporates by reference Paragraphs 1 through 153 above as if fully set forth therein.

155.    By engaging in the conduct described above, Wygovsky and Matthaei, directly or indirectly, connection with the purchase or sale of securities, and by use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, have, knowingly or recklessly:

    a.   employed devices, schemes, or artifices to defraud;

b.   made untrue statements of material fact or omitted to state material facts

necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading; and/or

c.   engaged in acts, practices, or courses of business which operated or would

operate as a fraud or deceit upon other persons.

156.    By reason of the actions alleged herein, Wygovsky and Matthaei violated and,

unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]

and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a final

judgment:

### **I.**

Permanently restraining and enjoining Wygovsky and Matthaei from directly or

indirectly engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. §

78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5];

### **II.**

Prohibiting Matthaei from serving as an officer or director of any entity having a class of

securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C.

§ 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C.

§ 78o(d)], pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

### **III.**

Ordering Wygovsky and Matthaei to disgorge all ill-gotten gains and pay prejudgment

interest thereon;

**IV.**

Ordering Wygovsky and Matthaei to pay civil penalties pursuant to Section 21A of the

Exchange Act [15 U.S.C. § 78u-l]; and

**V.**

Granting such other and further relief as this Court may deem just, equitable, or necessary

in connection with the enforcement of the federal securities laws.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands

that this case be tried before a jury.

Dated: March 30, 2023

Respectfully submitted,

s/ Karen M. Klotz
Karen M. Klotz (NJ Bar No. 021992001)
Gregory R. Bockin
Brendan P. McGlynn
Kevin E. Levenberg
U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 John F. Kennedy Boulevard, Suite 520
Philadelphia, PA 19103
Phone: 215-597-3100
Email: klotzk@sec.gov
*Attorneys for Plaintiff*
*Securities and Exchange Commission*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>        **Plaintiff,**<br><br>        **v.**<br><br>**SEAN WYGOVSKY and CHRISTOPHER MATTHAEI,**<br><br>        **Defendants.** | **Civil Action No. 2:23-cv-01810**<br><br>**JURY TRIAL DEMANDED** |

**DESIGNATION OF AGENT FOR SERVICE**

Pursuant to Local Civil Rule 101.1(f), because the Commission does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the above captioned action. Therefore, service upon the United States or its authorized designee, David Dauenheimer, Deputy Chief, Civil Division, United States Attorney's Office for the District of New Jersey, 970 Broad Street, Suite 700, Newark, NJ 07102, shall constitute service upon the Commission for purposes of this action.

s/ Karen M. Klotz
Karen M. Klotz
Philadelphia Regional Office
One Penn Center
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
Telephone: (215) 597-3100
Email: klotzk@sec.gov
*Attorney for Plaintiff*
Securities and Exchange Commission
